MILLER, Judge.
Texas Gas Transmission Corporation and Liberty Mutual Insurance Company perfected this suspensive appeal from a judgment signed in accordance with a jury verdict in favor of plaintiff-appellee, Barbe Goudeau, who was injured in an explosion of a gas sales meter.
The accident occurred in the early afternoon of February 14, 1967 at a gas meter station owned and maintained by Texas Gas. The station is situated on a 5,800 acre farm known as “Circle ‘B’ Ranch” in Cameron Parish. The Ranch is leased for farming, grazing and hunting purposes to Ronald Brewer, who in turn subleases to several tenant farmers who cultivate approximately 1,307 acres in rice and/or soybeans.
The metering station was installed in 1950 and except for normal maintenance had not presented any problems. The photographs in evidence show that the (farm tap metering) station is located on the edge of a rice field near a shell road. While there is not one sign posted, there is a fence constructed of what appears to be three-quarter inch pipes welded together to enclose an area roughly six feet by eleven feet. There is no gate in the fence and the entire fence consists of one vertical pipe at each of the four corners with two horizontal pipes welded to these corner posts to form the rectangular enclosure. The horizontal pipes were approximately 28 inches and 48 inches above the ground.
A schematic diagram of the metering •station is in evidence. We have taken the essential facts from that exhibit and use the following diagram to enable the reader to better understand the location of the bypass line, the valves, regulators and sales meter.

*682 Valves numbered 11 and 12 were owned and to be operated by Brewer, but were located within the fence as was the entire metering station. The remaining valves were to be operated by Texas Gas, but on occasion some of these valves were operated by the landowner with the knowledge of Texas Gas. Nevertheless, Texas Gas never explained to the customer the dangers involved in operating any of the valves. All pipes above ground were one-inch pipes and there was no warning that there was high pressure gas being distributed. Gas pressure at valves 1, 2 and 3 was 990 pounds per square inch and the normal flow of gas was from valve numbered one through valve numbered two through the first regulator which reduced the pressure. Then the pressure was further reduced in the second regulator such that the pressure was 35 pounds per square inch at valves number 5, 8, 9, 11 and 12 and of course at the sales meter between valves 8 and 9. Valve number three was provided for the by-pass line so that uninterrupted service could be provided even though there might be a malfunction in the regulators or in the meter. But no regulators were provided to reduce pressure in the by-pass line. To use the by-pass line to convey gas to the customer, Texas Gas would install a pressure gauge at valve number 10. Their employee would slowly open valve number 3 while watching the gauge to see that the pressure did not exceed 35 pounds per square inch. There is some expert opinion to the effect that this would be a dangerous operation, but we are not here concerned with that problem.
Valve number three was provided with a cover which prevented turning of the valve unless the cover was lifted. There was provision for a padlock to prevent lifting this cover, but it was proved that there had not been a lock on valve number three for at least four years prior to this accident. There is a factual question as to whether the cover was in place on the day of the accident. It was found on the ground after the accident and Le-Doux denies that there was any cover over valve number three at the time he proceeded to open the valve. (Tr. 611) On the other hand, when the meter was read some two weeks before the accident, the cover was observed to be in place.
On the day of the accident, Brewer was out of the state on a business and vacation trip and had left his foreman, Dwight LeDoux in charge. One of the foreman’s responsibilities was to drain a rice field which required the use of a natural gas fueled motor which in turn operated a water pump. The natural gas fuel was metered through the meter which exploded and seriously and permanently injured plaintiff. When LeDoux attempted to start the motor he found that there was no gas in the line. He checked at the meter to find that the (customer) valves were open but there was no flow of gas. LeDoux decided to call Texas Gas to get them to help, but on the way to a telephone he stopped at the Willis Broussard tenant house (on the Ranch) where Willis Brous-sard, Buddy Broussard, Claude Mott (all tenants to Brewer) were working with plaintiff to install plumbing. Plaintiff had contracted to install plumbing and septic tanks in five tenant houses at $100 per house, under an arrangement where all material and fixtures were furnished by Brewer and some labor was to be furnished by the tenants.
At the Broussard house, LeDoux inquired if anyone knew how to get the gas to flow. Plaintiff said he had seen Brewer turn it on before and he would go to the meter station with LeDoux. (Tr. 605, 610) LeDoux then brought plaintiff and the other three men to the meter station in his pickup truck. Not one of the parties suspected any danger involved in turning on the gas.
When the group of five men arrived at the meter station, LeDoux and Goudeau went inside the fenced area. Two others stood nearby but outside the fence and the *683 fifth remained in the pickup truck. They found valve numbered one open and valves numbered two and three closed. Goudeau told LeDoux to open valve number two and LeDoux used his own crescent wrench to open valve number two. They heard the gas make a rather loud noise as it went through the regulators and they thought that the noise indicated a leak in one of the regulators, whereupon Goudeau told LeDoux to close valve number two quickly. LeDoux closed it and Goudeau then started feeling the underside of the regulators when he noticed that LeDoux was then turning valve number three (on the bypass line). At about the same time that LeDoux turned valve number three, the sales meter which was designed to handle no more than 100 pounds per square inch, received the 990 pounds per square inch pressure and exploded causing the injuries for which plaintiff seeks to recover.
There is a serious factual dispute as to whether Goudeau told LeDoux to turn valve number three, but the preponderance of the testimony sustains Goudeau’s contention that he did not know LeDoux planned to turn valve number three until a moment before it was turned.
Appellants contend that the evidence preponderates to establish that plaintiff was a trespasser, or alternatively, a licensee, upon the premises, and his injury did not result from the breach of a legal duty owed him by Texas Gas. Even if so, appellants contend that the evidence does not establish that Texas Gas’ negligence was the proximate cause of the accident or resulting injury. Alternatively, even if it is found that Texas Gas was guilty of proximate negligence, appellants contend it should be found that plaintiff was guilty of contributory negligence which was a proximate cause of the accident. Alternatively, appellants submit that the award to plaintiff should be reduced.
The issues then are, did the jury err in finding (1) that Texas Gas breached a legal duty owed to plaintiff so as to make it responsible in damages? (2) that Texas Gas was guilty of negligence which proximately caused the accident? (3) that plaintiff was free from contributory negligence? (4) that plaintiff suffered damages in the sum of $135,000.00?
In support of its first allegation of error, appellant contends that Goudeau was a trepasser or alternatively a “licensee” and not an “invitee”. As stated in Alexander v. General Accident Fire & L. Assur. Corp., 98 So.2d 730 (La.App. 1st Cir. 1957):
“Most broadly, the following are the conventionally accepted distinctions between these classifications and the duties owed by the owner or the occupant of the premises to each:
“(1) A trespasser is one who enters the premises without the permission of the occupier or without a legal right to do so; and towards the trespasser no duty exists in most instances except to refrain from willfully or wantonly injuring him.
“(2) A licensee is one who enters the premises with the occupier’s express or implied permission, but only (according to the conventional description) for his own purposes which are unconnected with the occupant’s interests, and to him in addition to the duty owed to a trespasser, is owed the duty of warning the licensee of latent dangers of the premises if actually known by the occupier.
“(3) An invitee is a person who goes on the premises with the express or implied invitation of the occupant on the business of the latter or for their mutual advantage; and to him, the duty owed is that of reasonable and ordinary care, which includes the prior discovery of reasonably discoverable conditions of the premises that may be unreasonably dangerous, and correction thereof or a warning to the invitee of the danger.” 98 So. 2d at 731, 2.
*684 We do not find that plaintiff was a trespasser. While working on Brewer’s ranch, plaintiff was contacted by Brewer’s foreman to see if he knew how to get the gas to flow through the sales meter. Brewer’s foreman had instructions to pump water off the rice field, and Brewer testified that he knew that this required taking natural gas. Plaintiff had been with Brewer when Brewer operated valves on the Texas Gas side of the meter in order to get gas to flow through the sales meter. Texas Gas knew that Brewer and other owners on occasion turned the valves which were no the company side of the meter, yet Texas Gas never moved to prohibit Brewer from operating the valves nor did it inform him of the dangers. It is noted that Brewer testified that LeDoux had authority to ask plaintiff to give him a hand in getting the pump started. (Tr. 650) Under these circumstances the jury had ample evidence before it to conclude that plaintiff was a licensee or an invitee; that he entered the fenced area with the implied permission of Texas Gas for the purpose of getting gas to flow through the meter. This was to benefit both Texas Gas and Brewer. As a licensee, Texas Gas had the duty of warning plaintiff of the latent dangers bn the premises which were actually known by Texas Gas.
The dangers involved in this installation were fully appreciated by Texas Gas and its employees. For five or six years before this accident, the superintendent had instructed the employees in the field to keep such by-pass valves (as number three) locked. These instructions were acknowledged by the measurement specialist who inspected this meter station every month. The reason given for keeping the by-pass valve (number three) locked, was “to prevent an accident just like this from happening.” (Tr. 509, 510) The company recognized that there are dangers of the by-pass valve being opened inadvertently, accidentally, mischievously, or illegally. (Tr. 515) The superintendent acknowledged that many such installations of other companies had warning signs posted but they had never installed signs or warnings. Notwithstanding the company knowledge of the dangers involved in leaving the bypass valve unlocked, there had not been a lock on the valve for at least four years prior to the accident.
Concerning the missing lock on valve number three, the superintendent testified that:
“ * * * It was just one of those things that regretably wasn’t taken care of. I don’t know why the lock was not installed. * * * It’s always easy to talk about locking the stable door after the horse is stolen.”
The fact that all visible piping leading to and from the metering station was one inch pipe supports the testimony of plaintiff, LeDoux and indeed that of Brewer (Tr. 646, 647) that there was no reason to know about the danger from high pressure gas at the station.
We find that Texas Gas failed to observe its duty of warning of the latent dangers of the premises which were actually known to it in that (1) it failed to post any signs, (2) it failed to inform its customer (Brewer) of the dangers (Tr. 642, 645), and (3) it failed to keep valve number three locked, and (4) there was nothing in the manner which the system was designed to indicate the presence of high pressure gas at the station.
Appellants contend that the duty of Texas Gas to warn of dangers is directly related to the age, experience and knowhow of the person to whom that duty is owed. In this connection they point to the fact that plaintiff was 63 years of age, had retired as a master plumber some six years prior to the accident, and should have recognized that the presence of a locking device on valve number three indicated danger. But the preponderance of the testimony does not support appellant’s contention that plaintiff instructed LeDoux to turn valve number three, nor does it support *685 the contention that LeDoux saw a locking device covering valve three before LeDoux turned it. On the other hand, the evidence does support plaintiff’s contention that he did not know that LeDoux was going to turn valve number three until an instant before LeDoux turned it and the explosion occurred almost simultaneously. The jury had ample evidence before it to support its conclusion that there was nothing about the installation to place a master plumber on notice of the grave dangers presented by this metering station.
Appellants’ argument on its second position relating to proximate cause is summarized in their brief as follows: “Assuming for the purpose of this argument that Texas Gas Transmission Corporation was negligent in failing to lock the by-pass valve or post warnings against turning that valve, and that Mr. LeDoux turned the valve on his own volition and without direction from plaintiff, then it is submitted that his act in turning the valve was an independent, negligent act which superseded Texas Gas Transmission Corporation’s original negligent acts of omission. Put another way, it is submitted that Mr. LeDoux’s negligent act was the proximate cause of plaintiff’s injury, and the original negligence of Texas Gas Transmission Corporation was a remote cause, and therefore, a nonactionable cause. Hinegardner v. Dickey’s Potato Chip Co., 205 So.2d 157 (1st Cir., 1967); Kendall v. New Orleans Public Service, 45 So.2d 541 (Orl.App., 1950).”
Appellants further argue that “But for the fact that plaintiff and Mr. LeDoux were stationed where they were and acted as they did, injury would not have resulted to plaintiff.” They submit that plaintiff’s injury was not'within the realm of reasonable foreseeability.
We find support for the jury’s finding that plaintiff’s injuries were proximately caused by the negligence of Texas Gas. As noted in previously quoted testimony of the superintendent for Texas Gas, valve number three was to be kept locked to prevent accidents “just like this from happening.” Texas Gas knew that if valve number three was opened, pressure of 990 pounds per square inch would be placed in the sales meter designed to operate at a pressure of 35 pounds per square inch and which would explode at a pressure of 100 pounds per square inch. They knew of the possibility that the by-pass valve might be opened inadvertently, accidentally, mischievously or illegally. (Tr. 515)
We distinguish the cases cited by appellants (Hinegardner and Kendall) in that here, the accident was foreseeable and the act by LeDoux was not “irresponsible under the circumstances.”
We find no merit to the suggestion that this injury could not have occurred “But for the fact that Plaintiff and Mr. LeDoux were stationed where they were and acted as they did * * * ” The explosion was foreseeable. That only one of the five men in the vicinity was injured in the explosion is cause for comfort, but does not justify a conclusion that the only way plaintiff could have been injured was to have been in the position of bending down to feel the underside of one of the regulators at the time of the explosion.
On the issue of contributory negligence, appellants established that plaintiff is a retired master plumber, having held a master plumber’s license for approximately thirty years before retirement; that he installed gas operated heating systems of varying types in homes and schools and knew the purpose and function of a regulator ; and he knew that gas wells that produce in the area produce at high pressure. On the other hand, it was also established that a master plumber was not permitted to work on gas transmission lines.
Appellant contends that the actual undertaking of operating valves on the company *686 side of the meter constitutes unreasonable conduct for one possessing plaintiff’s knowledge and experience. But as noted before, plaintiff had witnessed similar action by Brewer. Appellant next contends that the operation should have been abandoned when plaintiff and LeDoux concluded that the regulator was leaking at the time that valve number two was opened. However the evidence indicates that when they suspected a leak in the regulator, plaintiff told LeDoux to turn off valve number two which was immediately done. Then plaintiff was in the process of checking the regulator when unknown to him, LeDoux turned valve number three causing the explosion. We do not find manifest error in the jury’s conclusion that plaintiff was free from negligence.
We find the jury’s award of $135,000.00 as damages manifestly excessive. We acknowledge that we are not to disturb the trial court’s award of general damages for personal injuries in the absence of abuse of the trial court’s great discretion, and that each personal injury must be evaluated according to its own peculiar facts and circumstances. Lomenick v. Schoeffler, 250 La. 959, 200 So.2d 127 (1957); Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963); 25 La.Law Review 545 (1965). Prior awards for seemingly similar injuries are relevant only insofar as they may indicate that the present award is so greatly out of proportion with past awards as to indicate a possible abuse of the trial court’s large discretion. We find that abuse in the instant case.
After two and one-half days selecting the jury and trying the case, the jury spent 30 minutes to select their foreman, decide the intricate issues of negligence and contributory negligence and then returned a verdict awarding plaintiff one-half the amount sought in the petition.
In this accident of February 14, 1967, plaintiff sustained compound fractures of the tibia and fibula of the left leg, simple fractures of the same bones in the right leg and a laceration over the right ankle. He was hospitalized until March 9, 1967, a period of slightly over three weeks. The evidence on damages consisted of hospital records, life span tables showing a life expectancy of 14.1 years at the time of the accident, photographs and x-rays of plaintiff’s legs, medical bills and specials totaling $3,425.05, and the testimony of plaintiff and his treating orthopedic surgeon, Dr. E. C. Campbell of Lake Charles.
Immediately after the accident, plaintiff tried to run from the escaping gas, but fell because his legs were broken. The other men dragged plaintiff away from danger, but plaintiff suffered for about an hour and a half while waiting for an ambulance to bring him to the hospital.
At the hospital plaintiff was given a general anesthetic and a closed manipulation of the fractures of the legs was accomplished and long leg casts were applied. Twenty-three days later, plaintiff was discharged from the hospital, and thereafter, more or less confined to a hospital bed in his home until approximately October 8, 1967. A trapeze bar, a commode chair, as well as a wheel chair, were used until about January 9, 1968. With both legs casted for four and one-half months and one leg for an additional two months, plaintiff testified that “ * * * it was hard to sleep, it was hard to lay down, it was hard to sit up; well, everything was just hard.” After the casts were removed, plaintiff started increasing his activities by using a wheel chair, then graduated to a walker, and then to canes, one of which he was still using at the time of the trial.
Plaintiff had better healing in the more seriously injured left leg than was obtained in the right leg. There is some question of the possibility of some fibrous union in the fracture of the tibia of the right leg. If there is a fibrous union of a small part of the tibia, rather than a solid bony *687 healing definitely obtained to all other fracture sites, Dr. Campbell would suggest further surgery. However, on this point, Dr. Campbell did not foresee the necessity for future surgery.
There was some bowing of the right leg and some chance for development of traumatic arthritis in the right ankle and osteoporosis in the left knee joint. Considering all of these factors, Dr. Campbell estimated that plaintiff had a permanent partial disability with respect to the right leg of 30% and a permanent partial disability approximating 20% of the left extremity.
The Doctor concluded that plaintiff’s daily routine of living would be affected by his disabilities, and the outdoor activities, such as hunting and fishing, would be somewhat curtailed. Prior to the February 1969 trial, plaintiff had been shooting skeet and had made more than one hunting trip.
Plaintiff who was 63 years of age at the time of the accident, has not proved any loss of earnings. His special damages total $3,425.05. He is not likely to have further surgery, but will certainly have additional medical expenses resulting from his injuries. His pain and suffering was severe for a period of several months. He was totally disabled for a period of approximately one year. He has1 a 30% permanent disability of the right leg and a 20% permanent disability of the left leg. Plaintiff was at the stage of life where he was able to enjoy his retirement with extensive hunting, fishing and other outdoor activities, all of which have been and will be somewhat curtailed.
Respecting the finding of the jury in its desire to be liberal in awarding damages, we find that an award of $60,000.00 for the pain, suffering and disability is proper.
For these reasons the judgment appealed from is amended by decreasing the amount of the award from $135,000.00 to the sum of $63,425.05. In all other respects, the judgment is affirmed. The costs of this appeal are assessed to defendants-appellants.
Amended and affirmed.
On Application for Rehearing.
En Banc. Rehearing denied.