275 So.2d 884 (1973)
David EPPERLY
v.
Josephine KERRIGAN et al.
No. 5303.
Court of Appeal of Louisiana, Fourth Circuit.
April 3, 1973.
Rehearing Denied May 1, 1973.
*885 Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, Ashton R. Hardy, New Orleans, for Josephine Kerrigan and Michigan Millers Mutual Ins. Co., defendants-appellants.
The Law Offices of Steven R. Plotkin, Owen J. Bradley, New Orleans, for plaintiff-appellant-appellee.
A. R. Christovich, Jr. and C. B. Ogden, II, A. R. Christovich, Jr., New Orleans, for New Orleans Public Service, Inc., defendant-appellee.
Before SCHOTT, BOUTALL and STOULIG, JJ.
SCHOTT, Judge.
This appeal was taken by defendants, Mrs. Josephine Kerrigan, and her liability *886 insurer, Michigan Millers Mutual Insurance Company, from a judgment taken against them in the amount of $20,000 in favor of the plaintiff, David Epperly. Plaintiff answered the appeal seeking an increase in the amount of the judgment and he also took an appeal from that portion of the judgment which dismissed his suit against a codefendant, New Orleans Public Service, Inc.
On March 23, 1967, the date of the accident, this 45 year old plaintiff, who is congenitally blind, had boarded a Public Service Bus at Jackson Avenue and Magazine Street and allegedly requested that the bus driver let him off at the corner of Camp and St. Joseph Streets where he had prearranged a meeting with a friend. When he got off the bus he soon realized that he was not at the right corner and he tried to find help so as to get to his destination. He then became involved with a group of people who offered to help him by leading him but instead began to taunt and tease him by misleading him into a lamp post or wall. He then entered the street where he sat down and lifted his cane as a sign for help. He was taken out of the street and led for a short distance by someone but when that person left him he again entered the street where he was struck by an automobile operated by Mrs. Kerrigan. He testified that he was "confused and scared" during the sequence of events which led up to the accident.
The accident occurred on Magazine Street in the City of New Orleans between Thalia and Melpomene Streets. In this area Magazine is a one-way street consisting of two moving lanes of traffic and parking lanes on both sides of the street.
The police officer who investigated the accident found 31 feet of skid marks left by Mrs. Kerrigan's car which came to a stop about two feet beyond the point of impact. Mr. Epperly was laying in the left lane of traffic about nine feet from the point of impact. The speed limit where the accident occurred is 30 miles per hour, and at the time of the accident, about 7:00 PM, it was dark or near dark, there were overhead lights illuminating the area and all of the drivers who witnessed the accident testified that their lights were on.
According to Mrs. Kerrigan, she had been traveling in the left lane of traffic along Magazine Street behind a cab for several blocks. She was by her testimony about one and one-half car lengths which, by her definition, would be from 10 to 25 feet behind the cab which suddenly swerved to the right when it was just beyond the intersection of Magazine and Thalia Street. At this point, her vision of the road ahead became clear and she saw the plaintiff in front of her standing on the road or walking in her direction in the center of the left lane in which she was traveling. Her pertinent testimony as to her reaction was as follows:
"Q. Mrs. Kerrigan, when the cab moved aside and you saw Mr. Epperly your first reaction was to take your foot off the accelerator and put it on the brake, is that right?
A. Yes.
* * * * * *
"Q. So we understand each other, you did not apply the full force of your brake immediately, true?
A. I put my foot on it.
Q. No ma'am. Explain to me carefully, just explain again, when the cab swerved the first reaction you had was to take your foot from the accelerator and place it on the brake but not depressing the brake first, true?
A. Yes
* * * * * *
"A. I put my foot on the brake lightly but when I saw the man continuing to walk I immediately pressed it down as far as I could.
*887 * * * * * *
"Q. Mrs. Kerrigan, using your own words, you transferred your foot as the first response from the gas, accelerator, but you did notthe first thing you did was take your foot from the gas?
A. Immediately.
Q. And apply it lightly on the brakes, is that right?
A. Yes.
Q. Then seeing more or moving forward you then pushed full hard on the brake, is that right?
A. Yes.
* * * * * *
Q. And to ask you only one last question: My associate has taken the quote out of your testimony, what we believe to be a quote. Did you say that you put your foot lightly on the brake and when you saw him continuing to walk toward you, you applied it hard?
A. Yes."[1]
Her car skidded in a straight line and came to a stop at almost the same point where the plaintiff was struck. She saw the upper part of his body come down on the hood of the car following which he was thrown off balance and fell backward. Her car was equipped with power brakes which were in good operating condition.
Two other witnesses testified concerning the facts of the accident, namely, the driver of the cab which was preceding Mrs. Kerrigan's vehicle before the accident and Mr. Patterson, a limousine chauffeur.
Patterson had come on the scene prior to the accident and as he traveled along Magazine Street he had seen the plaintiff sitting in the left lane of the street. He stopped and got out of his vehicle at a point beyond where the man was sitting and then realized that the plaintiff was blind, noticing the white cane on the pavement beside him. He testified that he offered to take the plaintiff to his destination and while the plaintiff was reluctant even to speak to him or to accept assistance from him, he was eventually able to persuade the plaintiff to leave the street and go back to the curb. At this point Patterson was joined by another individual who had come on the scene in an effort to help the plaintiff. The plaintiff seemed willing to accept help from the other passerby, whereupon Patterson proceeded back to his car, leaving the plaintiff and the other person walking along the riverside of Magazine Street on the sidewalk in the direction away from Patterson's vehicle. About the time he got back to his vehicle Patterson turned around and saw the plaintiff back in the street again, walking against traffic appearing to be trying to cross the street fluctuating between the lanes of moving traffic. He saw a cab swerve to avoid hitting the plaintiff followed shortly thereafter by the Kerrigan automobile which struck the plaintiff. At the time he had spoken to the plaintiff before the accident, when he had succeeded in getting him out of the street onto the sidewalk, Patterson described the plaintiff's condition as bewildered, confused, incoherent and very mixed up. At one point when Patterson tried to lift the plaintiff to help him out of the street the plaintiff became angry, excited and belligerent. He seemed fearful or afraid and unwilling to accept assistance.
The driver of the cab which preceded Mrs. Kerrigan's automobile testified that he was proceeding up Magazine Street when it was just starting to get dark and just after he had put on his headlights.
*888 He was in the left-hand lane about half way up the block between Thalia and Melpomene Streets when the plaintiff, who he knew at that time was blind, came from behind an automobile on his left into the street ahead of him. He slowed down and veered to the right so as to avoid striking him, coming to a stop in the right-hand lane of Magazine Street. As he stopped he heard the brakes of Mrs. Kerrigan's automobile and he saw the plaintiff go down in front of her car. He testified that before he had veered to the right the Kerrigan vehicle was about two car lengths behind him and at the time the plaintiff first stepped into the street from the parked automobile he was about 35 or 40 feet from him. This cab driver stated that he did not have any difficulting missing plaintiff but it was "pretty close." On cross examination this witness stated that when he saw the plaintiff walking toward him in the center of the lane he was 40 to 50 feet away from him, and at the point where he was about 20 feet away from the plaintiff he had enough time to move into the right lane. The right lane was unoccupied and nothing prevented him or Mrs. Kerrigan from changing lanes during this sequence of events.
The plaintiff offered the testimony of an expert traffic and safety engineer, Mr. John Exnicios, who testified that the skidmarks put down by Mrs. Kerrigan's vehicle indicated that she was traveling just under 25 miles per hour before the accident occurred. He further stated that when a driver is confronted with emergency a time lapse of three-quarters of a second occurs before the driver can react by applying the automobile's brakes. He interpolated that a vehicle moving 25 miles per hour would therefore travel 28 feet during this reaction period and would skid another 31 feet for a combined distance of 59 feet from the time the emergency is first noted. He also testified that national safety standards would have required Mrs. Kerrigan, traveling 25 miles per hour, to maintain a distance behind the cab she was following of 50 feet.
In his reasons for judgment the trial judge found that the actions of the plaintiff preceding the occurrence of the accident were not voluntary but were the result of terror so that his behavior did not constitute negligence under the circumstances. He found further that Mrs. Kerrigan was negligent and "had the last clear chance to avoid the accident." He was impressed by the fact that she did not press hard on the brake immediately when she discovered the emergency but rather had put her foot lightly on the brakes when she first saw the plaintiff and only applied the brakes hard after she saw him continuing to walk toward her. He found that she had an indication that "something was amiss when the cab swerved to the right" and her negligence consisted in her failure to apply her brakes hard at that point and immediately take steps to avoid striking the plaintiff.
The defendants specify error in the trial court's finding as a matter of law that Mrs. Kerrigan was negligent, that the plaintiff was not negligent, and holding that Mrs. Kerrigan had the last clear chance to avoid the accident.
The crucial question in this appeal is whether Mrs. Kerrigan was negligent. If she is exonerated it does not matter whether the plaintiff was negligent or not since he could not under those circumstances make any recovery from her.
It is the position of defendants that under the law Mrs. Kerrigan was charged only with a duty to act in a reasonably prudent manner and had a right to assume that the road ahead of her was safe for travel. They invoke the doctrine of sudden emergency and insist that Mrs. Kerrigan's actions should be judged according to the principle that where one does not have sufficient time to consider and weigh all of the circumstances or the best means that may be adopted to avoid an impending *889 danger in the form of a sudden emergency one is not guilty of negligence if one fails to adopt what subsequently appears to have been a better method of avoiding the accident.
These principles of law are correctly stated, but the facts of the instant case are not such that Mrs. Kerrigan can be exonerated after an application of the principles. It is significant that the cases cited by defendants Craker v. Allstate Insurance Company, 259 La. 578, 250 So.2d 746. Sanders v. Eilers, La.App., 217 So.2d 205, Gregoire v. Ohio Casualty Insurance Company, La.App., 158 So.2d 379, and Corkern v. McWilliams, La.App., 228 So.2d 236, are all distinguishable from the instant case on their facts. In Craker, the suit by a guest passenger against her host who had struck a stopped truck was dismissed, but significantly the accident occurred on a country road with no street lights in the rain and the truck was unlighted. The accident occurred at 4:00 o'clock in the morning. In Sanders, the plaintiff was lying unconscious on a highway at 1:00 o'clock in the morning where the posted speed limit was 45, and where there were no street lights along the highway. The defendant attempted to stop his automobile but left skid marks of 114 feet 11 inches. In Gregoire, the plaintiff decedent was lying in the roadway at approximately 2:00 AM when the defendant ran over his body. The defendant had been proceeding between 35 and 40 miles per hour and did not note anything in the road ahead of him until he was 30 feet from the plaintiff decedent. "He was then too close to swerve or "cut over' but he did apply his brakes and come to a stop at a point estimated at from 10 to 15 feet beyond" the body of the plaintiff. The Court discussed in detail the condition of the road which contained depressions into which parts of the decedent's body were resting so that the discovery of his body by an oncoming motorist was even more difficult than it would have been had he been lying on a flat surface. Also, the court noted that it was dark and visibility was poor at the scene of the accident. Finally, in Corkern, a pedestrian was struck on a highway by defendant who was traveling 60 miles an hour within the speed limit. Although he braked and swerved to the right he could not avoid striking the plaintiff.
These cases relied upon by defendants all support the following statement of the law which appears in Corkern v. McWilliams, supra:
"The rule is well established that one who operates a motor vehicle on public highways has a never ceasing duty to keep a sharp lookout ahead. A motorist is therefore held to have seen that which in the exercise of ordinary care he should have seen . . . (citations omitted) Thus, though as a general rule a motorist may assume that the road ahead is safe for travel, he must when traveling after darkness or in circumstances of limited or impaired visibility observe and so control his vehicle as to avoid discernible objects in his path of travel; that is, in adverse conditions a greater degree of care must be exercised. . . (citations omitted) This last rule however is subject to the well established exception that a night driver is not charged with the duty of guarding against unusual or unexpected obstructions which he had no reason to anticipate he would encounter on the highway and which under the circumstances are difficult to discover . . . (citations omitted)"
In the instant case we are not dealing with a situation of the night driver on a highway but rather a defendant who came upon the plaintiff on a well lighted city street while proceeding at a comparatively slow rate of speed. These facts are at the outset in sharp contrast with those cases which are relied upon by defendants to show that Mrs. Kerrigan was not negligent in striking the plaintiff.
But defendants argue that the standard of care to be applied to Mrs. Kerrigan is *890 governed by the doctrine of sudden emergency which was very recently expounded upon by the Supreme Court in the case of Hickman v. Southern Pacific Transport Company, 262 La. 102, 262 So.2d 385, as follows:
"One who suddenly finds himself in a position of imminent peril, without sufficient time to consider and weigh all the circumstances or best means that may be adopted to avoid an impending danger, is not guilty of negligence if he fails to adopt what subsequently and upon reflection may appear to have been a better method, unless the emergency in which he finds himself is brought about by his own negligence."
In that case, the Court reached a conclusion that the plaintiff should recover but only after a careful analysis of the facts of the accident which are wholly dissimilar to the facts in the instant case.
In analyzing the facts of the case, let us first accept the most favorable version from Mrs. Kerrigan's point of view. She testified that she was perhaps only 10 feet behind the cab when its driver swerved to the right. The cab according to the testimony of Mr. Exnicios was 18 feet long, and the cab driver testified that he began swerving when he was 20 feet from the plaintiff. Assuming that plaintiff then came into Mrs. Kerrigan's view when the cab driver was but 15 feet or even 10 feet from the plaintiff, this means that she was a full 38 to 43 feet from the plaintiff when she first saw him. The cab driver saw plaintiff step from behind a parked car on his left when he was 35 to 40 feet from him and he immediately recognized him to be a blind man he had seen "around for years." He was able to veer into the right lane when he was but 20 feet from the plaintiff and while his testimony was that he came "pretty close" he had no difficulty missing him, that after veering over he brought his cab to a stop in the right lane of Magazine Street and in the meantime was able to make a short statement to his passenger; that only after these events transpired did he hear Mrs. Kerrigan's brakes and see the accident. There is no explanation as to why Mrs. Kerrigan could not have executed the same maneuver as did the cab driver when she had considerably more distance between her and the plaintiff than did the cab driver when he swerved to the right. Certainly she was charged with the same duty and the same degree of care as was the cab driver and consequently was negligent in failing to take such evasive action.
It is not a matter of second guessing Mrs. Kerrigan and applying to her a standard of care which is too rigorous considering the fact that her conduct is being reflected upon in retrospect, because the record is clear to the effect that there was no traffic to her right and there was no effort on her part to swerve to the right in order to miss the plaintiff ahead of her in the street. In this connection, there is an interesting contrast with Layfield v. Altazan, La.App., 255 So.2d 363, which involved a 3-car collision precipitated by the lead vehicle suddenly and without signal switching from the outside to the inside lane, whereupon the second vehicle applied his brakes but was unable to avoid striking the lead vehicle with the further result that the third driver saw the collision, applied her brakes but ran into the rear of the second vehicle. In a claim by the driver of the third vehicle against the lead vehicle driver, the Court found that the emergency created as a result of the collision between the lead and the second vehicle was not one which could have reasonably been anticipated by plaintiff. The speed of plaintiff's car was only 20 to 30 miles per hour as in the instant case, but the evidence showed that she put her brakes on immediately upon the occurrence of the accident ahead of her and significantly the Court noted that there was traffic in the adjoining lane so that "there was nothing further she could do," implying that she would normally be under a duty to swerve her automobile in order to avoid striking the *891 vehicles ahead of her had such a maneuver been possible and practical. Similarly, in Gregoire v. Ohio Casualty Insurance Company, supra, the defendant who successfully invoked the sudden emergency doctrine negated to the Court's satisfaction the possibility of avoiding the accident by swerving over to avoid the plaintiff and in Corkern v. McWilliams, supra, defendant did swerve over but still could not avoid striking plaintiff. In the instant case, such a maneuver was available to Mrs. Kerrigan and was executed by the cab driver with relative ease even though he was considerably closer to the plaintiff when he recognized the danger than was Mrs. Kerrigan.
The case of David v. Houston Fire & Casualty Insurance Company, La.App., 242 So.2d 1, is significant in that the defendant was held liable to the plaintiff even though a sudden emergency was present and there was evidence to show that the defendant had exercised reasonable care in attempting to avoid the accident. In discussing the doctrine, the Court said the following:
"A motorist faced with a sudden emergency not of his own creation is not held to the same degree of care as is required of a motorist under normal circumstances. Faced with a sudden emergency not of his own making, a motorist is required only to react as an ordinary reasonably prudent individual would react. He is not charged with negligence because he fails to elect the best possible means available to avoid an accident. If he takes reasonably prudent evasive measures under the attending circumstances he has discharged the burden of care incumbent upon him . . . (citations omitted).
"Although a motorist faced with a sudden emergency is not held to the same degree of care as is required of a driver who has ample opportunity for the full exercise of judgment and reason, the motorist faced with such an emergency nevertheless is under a duty to exercise some degree of care. He is required to react as an ordinary reasonably prudent person would react and to take reasonably prudent evasive measures under the circumstances."
The record in the instant case shows that Mrs. Kerrigan's dereliction consisted in her failure to take evasive action similar to that taken by the cab driver in order to avoid striking the plaintiff.
If Mrs. Kerrigan's version of the accident is accepted, she is also faced with the problem that in the application of the sudden emergency doctrine it is available only to a motorist who is faced with an emergency not of his own creation and not of his own making and to which he did not contribute. Cobb v. American Indemnity Company, La.App., 256 So.2d 489, and Dick v. Phillips, 253 La. 366, 218 So.2d 299, 40 A.L.R.3d 1420. If Mrs. Kerrigan was only 10 feet from the rear of the cab as she testified she was negligent in that she was following the cab too closely in violation of the City Ordinance as well as the State Statute in this regard.[2] Had she been a proper distance behind the cab which, according to Mr. Exnicios, was 50 feet for the speed at which she was traveling then she would have been a total of from 68 to 73 feet from the plaintiff when he first came into view. This would have allowed ample room for her to veer to the right or even stop without swerving according to Mr. Exnicios who testified that she could have stopped in a distance of 59 feet under the circumstances.
*892 In our discussion of the case thus far, we have accepted Mrs. Kerrigan's estimate of the distance between herself and the cab because this would be most favorable to her in her contention that she was too close to the plaintiff when his peril was discovered in order for her to avoid the accident. This would be the best version of the facts for her to invoke the doctrine of sudden emergency. The farther away she was from the cab the more difficult it becomes for her to avoid liability, since with every foot added to that distance means she had that much more room in which to maneuver to avoid the accident. As a matter of fact, she was necessarily more than 59 feet away from the plaintiff when she first discovered him in the road ahead of her. The testimony of Mr. Exnicios was to the effect that a driver making an emergency stop going 25 miles per hour would require 59 feet in which to stop considering reaction time and skidding distance. Since the impact between Mrs. Kerrigan's car and the plaintiff was approximately at the point where her skid marks ended it necessarily follows that she was approximately 59 feet from the plaintiff when she decided to stop. But the portions of her testimony quoted above make it clear shat she did not apply her brakes hard when she first saw the plaintiff but, rather, lightly applied her brakes, thereby going some undetermined distance before she decided to make an emergency stop and before requiring 59 feet in which to do so. If she had applied her brakes in the first instance the accident could not have happened because she was necessarily more than 59 feet from the plaintiff when she first discovered his peril. Her failure to do so constituted negligence.
It may be said, however, that a fair reading of her testimony above does not mean that she saw the plaintiff when she first lightly applied her brakes but only that she was only beginning to sense that something was amiss ahead of the cab.
The case of Malone v. Hartford Insurance Company, La.App., 239 So.2d 697, is similar to the instant case. There the plaintiff was driving his automobile at least three car lengths behind the car ahead. The driver of the forward car put on his left blinker signal and applied his brakes, and although plaintiff could not see in front of the preceding vehicle he did suspect that there was a slow moving car in front of it. The vehicle preceding the plaintiff then turned into the inside or left lane, whereupon the plaintiff saw a pickup truck stopped in the right-hand lane approximately 100 feet ahead. Upon seeing the stalled vehicle immediately in front of him Malone glanced into his rearview mirror and concluded that he could not execute a turn into the left lane so that his only course of action was to jam on his brakes notwithstanding which a collision ensued. The Court found that the plaintiff was negligent because he saw the driver of the car in front of him put on his left turn signal and hit his brakes and he was aware and thought at the time that there was an obstruction in front of that car. Thus, he should have taken precautions to bring his vehicle under control so as to be able to stop quickly to avoid the obstruction. "His failure to react upon becoming aware of the possible obstruction in traffic was negligence which bars his right to recovery in this case."
The Malone case is also significant in that the plaintiff did specifically negate the possibility of his veering into the other lane in order to avoid the accident whereas Mrs. Kerrigan cannot do so in the instant case.
The defendant's contention that the plaintiff was negligent has merit. The facts show that the plaintiff did become confused and disoriented prior to the accident, but he was offered assistance from Mr. Patterson which he refused. The evidence shows that he was highly self-sufficient in regard to getting around the city *893 streets and he necessarily knew that he was placing himself in a perilous position when he entered Magazine Street. To that extent we hold that the trial judge was in error in finding that the plaintiff was not negligent, but from the facts as have already been discussed it is apparent that the doctrine of last clear chance has clear application to the facts of the instant case. The elements of the doctrine are correctly stated in Gregoire v. Ohio Casualty Insurance Company, Supra, to the effect that, 1) the injured plaintiff was in a position of peril of which he was either unaware or from which he was unable to extricate himself; 2) defendant was in a position to discover plaintiff's peril, or by the exercise of reasonable care, should have observed plaintiff's danger; and 3) defendant must have had an opportunity through the exercise of reasonable care to avoid injuring plaintiff. This doctrine presupposes that plaintiff was negligent in the first instance, but is an exception to the ordinary rule that contributory negligence bars the recovery of the plaintiff.
Defendants argue that the doctrine is not available because Mrs. Kerrigan was not in a position to discover plaintiff's peril until it was too late for her to avoid the accident despite the exercise of reasonable care. We hold to the contrary under the facts of the case for the reasons already stated.
The trial judge held that New Orleans Public Service was negligent but its negligence was not a proximate cause of the accident. The evidence to support this charge of negligence consists wholly of the testimony of the plaintiff and is not convincing. In any event, pretermitting that question adversely to that defendant, the record shows that considerable time elapsed from the plaintiff's exit from the bus until this accident occurred, and while he was originally in a position of helplessness he subsequently was offered but rejected transportation to his destination by Mr. Patterson. This action on plaintiff's part certainly constituted an intervening independent cause for that which followed.
As an alternative plea, the defendants contend that the trial judge erred in making an excessive award of damages to the plaintiff. The plaintiff suffered a broken hip, broken knee and broken shoulder. He remained in Charity Hospital from March 23 until May 30, or a total of 69 days of initial hospitalization. He was placed in traction at the outset for the hip and the knee, a pin was inserted just above the knee and the left arm was immobilized by means of a velpeau dressing which consisted of bandaging the left arm and forearm to the body of the plaintiff. On April 14 the plaintiff was subjected to an operation so as to reduce the fracture of his hip and a Smith Peterson nail and Thornton plate were inserted in order to stabilize the hip. The velpeau dressing was removed in three weeks after which plaintiff's arm was placed in a sling. He was placed in a long leg cast for six weeks following the operation which occurred on April 14, and at the time of his discharge from the hospital he was not ambulatory and was sent to a nursing home. By June 25 the plaintiff was still in a wheel chair and doing limited weight bearing but was not able to place his full weight on either one or both of his legs. He was then started on crutches. By October 31 the plaintiff could walk without crutches and on May 14, 1968, the plaintiff was discharged. The plaintiff was left with traumatic arthritis in the knee as a result of the accident, a 5 per cent disability of the left shoulder and a 15 per cent disability of the left leg. His prognosis is that he may go through episodes of pain, swelling and progressive stiffness, the inability to extend the knee and the fact that "it may come to a point where the man may limp because of the traumatic arthritis."
The testimony of this blind plaintiff demonstrates that his recovery from these multiple injuries was characterized by an unusual degree of mental anguish. For his *894 first weeks in the hospital he said that he was as "helpless as a three-month old baby" unable to feed or perform a single function for himself. It was most difficult for him to learn the use of crutches and at the same time to be deprived of his cane on which he depended so much. His convalescent period at the nursing home was depressing and lonely as he was almost exclusively in the company of persons of advanced age. The medical bill from Charity Hospital to the plaintiff came to $2856.35. There is evidence that plaintiff lost some income normally earned by selling pencils, odds and ends, on the street corner.
The trial judge awarded a lump sum of $20,000.
Defendants cite a collection of cases to support a decrease in the award. But when those cases are compared with such cases as Godeau v. Texas Gas Transmission Corp., 225 So.2d 679 (La.App., 3rd Cir.), Poche v. Frazier, 232 So.2d 851 (La.App., 4th Cir.), and Odom v. Texas Farm Products Company, 229 So.2d 118 (La.App., 2nd Cir.), it cannot be said that there was an abuse of discretion by the trial court in his award to plaintiff.
Affirmed.
BOUTALL, Judge (concurring):
I concur upon the facts as I see them, I cannot say that the trial judge committed manifest error. However, I do not agree that the duty of swerving to another lane should be imposed upon the following driver under these circumstances when the taxicab in front changed lanes.
STOULIG, Judge (concurring):
I concur.
The determination of Mrs. Josephine Kerrigan's negligence in failing to prevent the accident by timely bringing her vehicle to a stop or swerving into the adjoining traffic lane required a critical evaluation of the credibility of the witness, coupled with the trial court's conclusion that the relative lineal distances between the Kerrigan automobile, the preceding taxicab, and the pedestrian in front of it, afforded her sufficient opportunity to adopt either of these evasive actions necessary to avoid striking the plaintiff.
While I am not in complete accord with these findings, it does not affirmatively appear from the record that these factual conclusions are manifestly erroneous. For this reason, I concur in the affirmance of the judgment of the trial court.
NOTES
[1] Defendants contend that much of this testimony was the result of questions taken out of the context of her pre-trial deposition so that the entire deposition was placed in evidence, but a reading of her deposition satisfies us that her testimony then was essentially the same as it was at the trial.
[2] The Code of the City of New Orleans Section 38-138

"The driver of a vehicle following another vehicle shall at all times maintain a reasonable distance between such vehicle so that if the preceding vehicle should come to a sudden or emergency stop, the operator following shall not collide with the rear of such vehicle."
LSA-R.S. 32:81, subd. A.
"The driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicle and the traffic upon and the condition of the highway."