297 So.2d 733 (1974)
Floyd WAGGENSPACK et al.
v.
NEW ORLEANS PUBLIC SERVICE, INC.
No. 5782.
Court of Appeal of Louisiana, Fourth Circuit.
July 10, 1974.
Rehearing Denied August 5, 1974.
Writ Refused October 18, 1974.
*734 Charles J. Ferrara, Metairie, for plaintiffs, appellees.
A. R. Christovich, Jr., and C. B. Ogden, II, New Orleans, for defendant, appellant.
Before BOUTALL, J., and LEON, and NOBILE, JJ., Pro Tem.
AUGUST A. NOBILE, Jr., Judge Pro Tem.
This appeal was taken by the defendant, New Orleans Public Service, Inc. from a judgment taken against it in the amount of $2,716.00 in favor of the plaintiff, Floyd Waggenspack, individually, in the amount of $216.00, and as administrator of the estate of his minor son, Gerard Waggenspack, in the amount of $2,500.00.
In the night time hours of February 13, 1969, the date of the accident, Gerard *735 Waggenspack, a 15 year old boy in company of two other teenage boys, boarded a public service bus at Canal and Basin Streets for the purpose of returning home after a pre-carnival parade which the youngsters had attended. The bus was fully loaded with 80-90 passengers and within a short time after leaving the origination point a disturbance was created by some of the passengers on the bus. It was shown in evidence that the disturbance was a group activity by some of the passengers who in addition to using boisterous and obscene language vandalized the bus including damage to the rear door which they broke and were operating independently of the bus driver's control. The disturbance was such that the driver stopped the bus in front of a barroom in close proximity to a regular bus stop where he could use a telephone to seek help in handling the situation. As a result of his telephone call to his dispatcher at the company office, a regular police unit with two uniformed police officers and an unmarked unit with two plainclothes police officers were dispatched to the scene. Two company dispatchers also went to the scene of the parked bus. The bus driver, Howard Wiltz, remained in the barroom until help arrived. By that time approximately one-half of the passengers on the bus had already left the bus and dispersed. Gerard Waggenspack and his teenage companions remained on the bus until the remaining passengers were instructed by the bus driver that they would have to disembark and catch another bus since this bus was being taken out of service. Transfers were provided for those passengers on the bus and it appears that most of them moved to the nearby bus stop to await another bus. It was apparent that the uniformed police soon left the scene of the parked bus and one of the dispatchers, Etienne Senac, returned to the company grounds after instructing the bus driver to drive his now empty bus to the company grounds and following him there in his own vehicle. The decision to secure another bus for transporting the remaining passengers was made by Mr. Senac who indicated he made this decision after two or three buses had passed, but he could give the Court no estimate of what time had elapsed before he left the scene. Mr. Richard E. Mullen, Jr., the other company dispatcher on the scene remained on the scene until the passengers embarked on a bus dispatched for that purpose. In the meantime Gerard Waggenspack and his companions, fearing for their safety in company of the crowd of people awaiting other transportation, decided to walk to another bus stop. After walking several blocks they stopped at a succeeding bus stop where they were approached by a teenage gang one of whose members without provocation broke a bottle on the side of Gerard Waggenspack's head resulting in the damages sued for and sending them into a disordered retreat to the safety of a business establishment where they could call for help.
The trial judge evidently had no doubt of the genuine fear which guided the decision of the youngsters to move to another bus stop and this Court is convinced that their fear precipitated them into the very situation that they were fearing i. e. injury from the demonstrated riotous behavior of others. The question presented in this case is whether the public carrier was negligent and whether such negligence was the proximate cause of injuries suffered by Gerard Waggenspack from his unidentified attackers.
The defendant takes the position that the plaintiff voluntarily removed himself from any ambit of passenger status when he chose to leave the site of the disabled bus and that defendant should not bear the burden of the ultimate consequences. Much was taken in evidence in the trial Court about the racial composition of the passengers, the policemen and the neighborhood where the passengers were disembarked and much was said in argument proand con about the justification and nonjustification of the recognition of racial overtones for the victim's fright and possibly his improvident decision to protect his *736 safety, all of which the Court considers unnecessary to delve into for the purpose of determining the factual situation that led to the ultimate damages suffered by the plaintiff.
It is obvious from the testimony of the bus driver, Howard Wiltz, that he was confronted with a situation with which he could not cope and which he considered dangerous to himself.
"Q. As you went down North Claiborne did anything occur on your bus?
A. Yes Sir.
Q. What was it?
A. After I stopped at Orleans and Claiborne and dropped some passengers off, and some got on, I drove up to Esplanade and they were using obscene language and cussing, so I got up to Esplanade and told the kids to stop cursing and hollering because they had elderly people on the bus and they told me to `Go ahead and drive the bus, Tom' and they quieted down a little bit and I heard something breaking, you know, the Riders' Digest, breaking them up, the back door, and I couldn't move no more and I got off, pulled the emergency brake on, took my change and watch and called the dispatcher.
* * * * * *
Q. Did you say anything at all, why you were getting off the bus?
A. I said, "I can't do anything with you, I'm going to call the police.'
* * * * * *
Q. You say from this point you called the police or called the dispatcher?
A. I called the dispatcher.
Q. And you told him something had happened on the bus?
A. I told him they had torn up all the Riders' Digest and the back door was broke, I couldn't operate it no more, and he told me to take all my stuff off the bus and stay right at the telephone until the police come, if I went out there they might jump me or something by having such a large crowd."
From Howard Wiltz's testimony there could be no doubt that he considered that he himself was in a precarious predicament, that he convinced his dispatcher that a dangerous condition existed and that the company dispatcher in keeping with this belief advised the driver to remain inside to protect his own person until help arrived. In the face of these facts it is understandable that the peaceable passengers on the bus must have been justifiably and genuinely concerned for their own welfare and safety. Those passengers for their own safety remained on the disabled bus while the rioters disembarked for fear of apprehension by the police who were being summoned as announced by the bus driver on leaving. It was also evident that by the time the police arrived no miscreants could be identified and apprehended.
It is the Court's belief that a reasonable degree of care would have dictated that the remaining passengers on the bus be allowed to remain on the disabled bus until such time as a relief bus arrived to take them to their destinations. Instead, before a relief bus was even summoned, the remaining passengers were banished to the very street to which the miscreants had fled under cover of darkness, for the uncertain purpose of boarding another bus if one became available. When it became apparent to the supervising dispatcher Mr. Senac that succeeding buses were too loaded to accommodate the disembarked riders he decided to summon a special bus for that purpose. It was also apparent that none of the disembarked passengers were privy to Mr. Senac's decisions and, judging from his decision to disembark them from a safe haven apparently for the sole purpose of a speedy return of his employer's equipment to employer's grounds, his judgments certainly would have been questionable *737 to a reasonable mind. Accordingly, the decision of Gerard Waggenspack and his companions to seek another bus stop appears to have been a prudent one under the circumstances and a decision that was forced upon them by the omission of the dispatcher to make a reasonable and prudent decision for the safety of those intrusted to his care.
In the judgment of the Court the defendant did not exercise that highest degree of care which is owed to a fare paying passenger of a common carrier and which is a well established principle of law. This principle of law was more recently applied in Lewis v. Shreveport Transit Company, Inc., 231 So.2d 471 where the Court in awarding judgment affirming the lower Court as follows:
"Public carriers of passengers are required to exercise the highest degree of care. Commission by the carrier of any act of negligence contributing to accidental injury to a passenger, or the omission by the carrier of any act of prudence, care, or caution which might result in avoiding such an injury, subjects the carrier to liability.
King v. King, 253 La. 270, 217 So.2d 395 (1968);
Wise v. Prescott, 244 La. 157, 151 So. 2d 356 (1963);
Henderson v. Baton Rouge Bus Company, 217 So.2d 422 (La.App., 1st Cir. 1968);
Barnes v. Toye Brothers Yellow Cab Co., 204 So.2d 83 (La.App., 4th Cir. 1967);
Landry v. Ed's Cab Service, Inc., 185 So.2d 27 (La.App., 4th Cir. 1967);
Johnson v. Shreveport Transit Company, 137 So.2d 463 (La.App., 2d Cir. 1962);
Adams v. Canal Insurance Co., 127 So.2d 40 (La.App., 1st Cir. 1961cert. denied).
Moreover, when a passenger in a public conveyance is injured as the result of an accident, the burden of proof is on the carrier to show it was free of negligence."
A more seriously disputable situation is presented to the Court as to the proximate as opposed to the remote causation of the injuries to Gerard Waggenspack and the foreseeability of the consequences of a negligent act. The general jurisprudence of Louisiana is that negligence in order to be actionable need not be the sole cause of the harm but in fact that it be a cause for which recovery is sought. Perkins v. Texas and New Orleans Railroad Co., 243 La. 829, 147 So.2d 646; Lawson v. Continental Southern Lines, Inc., La.App., 176 So.2d 220; and Miller Car Washes, Inc. v. Crowe, La.App., 245 So.2d 485. In Jackson v. Jones, 224 La. 403, 69 So.2d 729, the Court applied the criterion that the person creating the danger could or should reasonably foresee the accident that might occur and if such were the case that he would be liable notwithstanding the intervening cause. That case involved a situation where Jones exposed some school children to unattended lumber containing protruding nails where the plaintiff's injury was precipitated by the push of another child. The Court considered that the injury was the proximate cause of an initial wrongful act.
As to foreseeability in the instant case there was no question that some injurious act to another person was a distinct possibility under the prevalent circumstances. The bus driver feared one, the dispatcher feared one and the injured party feared one. The action of the injured party in seeking safety independently of the dispatcher was a prudent decision under the circumstances and the fact that he suffered the very fate that each considered as a possibility and possibly a probability, does not because of his independent action relieve the carrier of the obligation of taking positive and reasonable *738 action in safeguarding the welfare of passengers intrusted to its care. The act of the dispatcher Mr. Senac in disembarking passengers to an area where danger was most likely to occur did in fact increase the possibility and foreseeability of injury to those intrusted to his care.
In Epperly v. Kerrigan et al, 275 So.2d 884 this Court held in relatively analogous initial circumstances that the negligence of the same defendant involved herein was not a proximate cause of the accident and in so holding stated as follows:
"The evidence to support this charge of negligence consists wholly of the testimony of the plaintiff and is not convincing. In any event, pretermitting that question adversely to the defendant, the record shows that considerable time elapsed from the plaintiff's exit from the bus until this accident occurred, and while he was originally in a position of helplessness he subsequently was offered but rejected transportation to his destination by Mr. Patterson. This action on plaintiff's part certainly constituted an intervening independent cause for that which followed."
This was a case in which a blind passenger was disembarked at a stop different from that at which he desired to be deposited and who ultimately suffered injury when run over by a vehicle in his meanderings after he had been discharged as a passenger. In this particular case it was obvious that his discharge as a passenger was a remote factor in the chain of events that ultimately caused his injury and that the injured's own independent poor judgment confounded his situation and caused him to be exposed to the negligence of the perpetrator. Such was not the case in the instant matter where the injury suffered was not only predictable but in fact recognized as a possibility by the bus driver who feared for his own safety.
The defendant-appellant did not question the extent of the damages awarded by the trial judge and it was the opinion of the Court that such award was suitable for the damages evidenced on trial.
Affirmed.